UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELENA O'CONNOR,

        Plaintiff,

v.

MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

No. C-09-01508 JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR AWARD OF BENEFITS [Docket Nos. 19, 20]**

## I. INTRODUCTION

Plaintiff Elena O'Connor ("O'Connor") applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on January 27, 2005. The application was denied both initially and on reconsideration on the grounds that O'Connor was not disabled within the meaning of the Social Security Act and accompanying regulations. A hearing was held on April 5, 2007, with Administrative Law Judge ("ALJ") John J. Flanagan presiding. In a decision dated June 20, 2007, the ALJ denied the claim, concluding that although O'Connor suffered from severe impairments that rendered her unable to perform her past work, she remained capable of adjusting to other employment in the national economy. Administrative Record ("AR") at 22. The ALJ's denial became the final decision of the Commissioner when the Appeals Council denied O'Connor's subsequent request for review on February 12, 2009. O'Connor then commenced this action for judicial review pursuant to 42 U.S.C. §405(g). O'Connor asks the Court to reverse the Commissioner's decision and remand the case for an award of benefits, or alternatively for further proceedings, on the grounds that the denial was neither supported by substantial evidence nor free from legal error. Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion at 1, 15.

O'Connor filed a motion for summary judgment ("O'Connor's Motion") on February 19, 2010.  The Commissioner filed an opposition to O'Connor's Motion and a cross-motion for summary judgment ("Commissioner's Motion") on March 19, 2010.  The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  Docket Nos. 5, 10.  For the reasons stated below, O'Connor's Motion is GRANTED and the Commissioner's Motion is DENIED.

## II.  BACKGROUND

### A.  O'Connor's Background

O'Connor was born on April 12, 1973, apparently in Russia.  AR at 414.  She completed high school and college in Russia with an undergraduate degree in music and economics.  *Id.* at 415.  O'Connor moved to the United States in approximately 1994 and became a citizen in 1999.  *Id.* at 416.  Her relevant past work, as designated by the ALJ, includes salesperson and store manager for General Nutrition Centers from 1997 to 1999 and photographer for Olin Mills from 2000 to 2002.[1]  *Id.* at 108.  O'Connor was 31 years old as of August 30, 2004, the alleged onset date of her disability.  *Id.* at 414.

### B.  The Administrative Hearing

The ALJ held an administrative hearing on O'Connor's claims for disability insurance benefits on April 5, 2007.  *Id.* at 408.  O'Connor, represented by attorney Aggie Rose Chavez, appeared and testified along with vocational expert ("VE") Malcolm Brodinsky.  *Id.*

At the hearing, O'Connor testified that she had suffered trauma from an early age due to a violently alcoholic father and later an alcoholic husband.  *Id.* at 427.  According to O'Connor, "I was at the point that I just want to die and wanted a relief."  *Id.*  O'Connor also testified that she witnessed her aunt's and cousin's deaths in a robbery in 2000, and that she lost her grandmother soon afterwards due to the same incident.  *Id.* at 426-27.

---

[1] The years cited here are from O'Connor's "Work History Report" dated April 18, 2005.  AR at 108.  However, during the hearing, Plaintiff's attorney and the ALJ agreed that O'Connor worked at Olin Mills in 2003.  AR at 418, 423.

2

1        As a result of the above traumatic experiences, O'Connor allegedly struggles with night
2   terrors and wakes up screaming in the middle of the night. *Id.* at 428.[2] She testified that she used to
3   have visions of her aunt's and cousin's faces screaming every night before bed, and that she has
4   been prescribed Trazodone for her difficulty falling asleep and staying asleep. *Id.* at 429, 435.
5   O'Connor stated that in October 2005 she was hospitalized and treated for an anxiety attack, during
6   which she had trouble breathing and felt like she was going to die. *Id.* at 431-32.

7        O'Connor testified that she began receiving treatment for depression at the age of 17 or 18 in
8   Russia. *Id.* at 426. In August 2004, O'Connor began to see Dr. Martinez, who prescribed her
9   Prozac. *Id.* at 425, 428. She decided to seek treatment at that time because "I was just, I felt
10  constantly being sad, being, I feel overwhelming with my negative thoughts. I'm just feeling down.
11  I want to cry all the time, you know. Just figure that I better ask for some, some help." *Id.* at 425.
12  Later in 2004, O'Connor was referred to Dr. Faramazyan at Contra Costa hospital, who is still her
13  treating psychiatrist. *Id.* at 424. Dr. Faramazyan diagnosed O'Connor with Major Depressive
14  Disorder and post-traumatic stress disorder ("PTSD") and continued to treat her with medication.
15  AR at 245, 298-99, 307, 315. O'Connor stated that she currently takes Lexapro, Trazodone, and
16  Wellbutrin. *Id.* at 429-30.

17       O'Connor testified that the above medications help to ameliorate her symptoms. *Id.* at 430.
18  However, she still "stay[s] in bed all the time" because she feels "constantly tired" and is afraid of
19  having a panic attack if she goes outside. *Id.* at 433, 440. O'Connor lives with her ex-husband, who
20  cooks, does the laundry, and generally takes care of her. *Id.* at 434-35. O'Connor washes her own
21  dishes and sometimes goes grocery shopping; however, her only social activity is accompanying her
22  ex-husband to church. *Id.* at 435. O'Connor also testified that she occasionally travels to Russia to
23  visit her family and receive psychiatric treatment. *Id.* at 438.

24       In addition to her psychological symptoms, O'Connor testified that her "back hurts a lot" and
25  radiates pain to her right leg, a condition she has experienced since the age of 19 or 20. *Id.* at

---

[2] It is not clear from the record whether O'Connor's night terrors are an ongoing problem or predominantly an episode from the past. AR at 428.

3

432-33.  She has been prescribed Naproxen, which she takes three times per day.  *Id.* at 433.

O'Connor testified that she was fired from her position at General Nutritional Centers because "my supervisor wasn't happy way I performed.  Probably said they wasn't happy with I, way I stay not alert enough on the, at work.  And we have a service, probably say never smile, never happy, and just my outer look wasn't satisfaction to my manager."  *Id.* at 418.  O'Connor voluntarily left her position at the Olin Mills Camera Store because she "didn't want the people see what's going on with me.  And I, at the moment I felt responsible for, you know, all of those little kids handling, especially for babies.  I didn't want something happen to them while I have such attacks, so I just, I left."  *Id.* at 423.  She testifies that difficulty concentrating is the biggest obstacle to her employment and that she "can't handle stress at all."  *Id.* at 436-37.

The VE also testified at the hearing.  *Id.* at 441-45.  The ALJ asked the VE several hypothetical questions, including whether a person restricted to "light exertional activity" and "simple repetitive tasks" with "little contact with others" would be capable of performing any of O'Connor's past jobs.  *Id.* at 442-43.  The VE testified that such a person would not be capable of performing O'Connor's past employment.  *Id.* at 443.  The ALJ then asked whether any other positions would be consistent with the limitations described.  In response, the VE listed two categories of employment - bench assembly and mail clerk.  *Id.*  The ALJ then added several additional restrictions to the original hypothetical, including moderate restrictions on "concentration, persistence and pace" and the ability to "complete a workday without interruption from psychiatric-based symptoms."  *Id.* at 444.  He then asked the VE whether such a person would still be capable of performing the jobs of bench assembly and mail clerk, which the VE denied.  *Id.*  In fact, the VE testified that a moderate limitation in either of the two categories described by the ALJ, *or* in the ability to "tolerate the stress of daily work activity," would "preclude all work."  *Id.* at 444-45.

### C.    The ALJ's Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically

4

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). A claimant is only found to be disabled if his physical or mental impairments are of such severity that not only is he unable to do his previous work, he also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996), *cert. denied*, 519 U.S. 881 (1996). However, once the claimant shows that he cannot return to his previous employment, the "burden of proof shifts to the [Commissioner] . . . to show that the claimant can do other kinds of work." *Valentine v. Comm'r. Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The Commissioner utilizes a sequential, five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. See 20 C.F.R. §404.1520(a)(4). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." *Id.* §404.1520(a)(4)(i). If the claimant is so engaged, the Commissioner finds the claimant not disabled and ends the evaluation. *Id.* If the claimant is not so engaged, the Commissioner proceeds to Step Two. *See id.*

At Step Two, the Commissioner considers whether the claimant has "a severe medically determinable physical or mental impairment" that has lasted, or is expected to last, at least twelve continuous months. *Id.* §404.1520(a)(4)(ii); *Id.* §404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* §404.1520(c). If the claimant does not have a severe impairment, the Commissioner finds the claimant not disabled and ends the evaluation. *Id.* §404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner proceeds to Step Three. *See id.*

At Step Three, the Commissioner considers whether the claimant's impairment "meets or equals" one of the listed impairments that the Social Security Administration has designated as disabling. *Id.* §404.1520(a)(4)(iii). If the claimant's impairment meets or equals one of the listed

5

impairments, the Commissioner finds the claimant disabled. *Id.* If the claimant's impairment does not meet or equal a listed impairment, the Commissioner proceeds to Step Four. *See id.*

At Step Four, the Commissioner considers whether the claimant can continue to perform work he has performed in the past. *Id.* §404.1520(a)(4)(iv). The ALJ first determines the claimant's residual functional capacity ("RFC"), which is "the most [the claimant] can still do despite [his] limitations," based on all relevant evidence in the record. *Id.* §404.1545. If the RFC assessment indicates that the claimant can perform his past work, the Commissioner will find the claimant not disabled. *Id.* §404.1520(f). If the assessment indicates that the claimant cannot perform his past work, the Commissioner proceeds to Step Five. *See id.*

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work." *Id.* §404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant is capable of performing other work that "exists in significant numbers in the national economy." *Id.* §404.1560(c); *Valentine,* 574 F.3d at 689. If the claimant can make an adjustment to other work, the Commissioner finds him not disabled. 20 C.F.R. §404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds him disabled. *Id.*

### D.     The ALJ's Findings of Fact

In this case, the ALJ found at Step One of the evaluation process that O'Connor had not engaged in any substantial gainful activity since the alleged disability onset date of August 30, 2004. AR at 17.

At Step Two, the ALJ found that O'Connor's "mild degenerative disc disease" and "intermittent history of depression and anxiety" constituted severe impairments. *Id.*

At Step Three, the ALJ found that O'Connor does not have an "impairment or combination of impairments that meets or medically equals one of the . . . impairments" listed in 20 C.F.R. §404, Appendix 1. *Id.* at 18.

At Step Four, the ALJ found that O'Connor "has the residual functional capacity to perform less than a full range of light work as described at 20 CFR §§ 404.1567(b) & 416.967(b)." *Id.* at 18.

6

He also found that O'Connor is "restricted to the performance of simple, repetitive work activity with no more than occasional contact with co-workers, the public, or supervisors." *Id.* He further limited her to "low stress work, performed at lower competitive levels with very basic one and two step job requirements." *Id.* Based on this RFC analysis, the ALJ concluded that O'Connor was not capable of performing her past relevant work at General Nutrition Centers or Olin Mills photography. *Id.* at 21.

In reaching this finding, the ALJ "considered all symptoms and the extent to which the[] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* at 18. The ALJ "also considered opinion evidence," according "considerable weight" to the opinions of Dr. Jasdeep S. Aulakh, the psychiatric consultative examiner, and Dr. Howard Sturtz, the orthopedic consultative examining surgeon. *Id.* at 21. The ALJ found that O'Connor's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* at 20-21. Specifically, he noted that O'Connor traveled to and from Russia on several occasions, which undermined her claim of "total inability to function both physically and mentally." *Id.* at 20. Second, he concluded that the treatment she had received was primarily routine outpatient care as opposed to emergency treatment or involuntary commitment. *Id.* Third, he noted that O'Connor appeared "spontaneous and responsive" at the hearing and had no visible physical incapacities. *Id.* Fourth, he found her testimony to be "vague and non-specific." *Id.* Finally, he concluded that O'Connor attempted to downplay the level of her English language skills, which demonstrated a lack of credibility. *Id.*

At Step 5, the ALJ applied the same RFC to determine whether O'Connor was capable of adjusting to other jobs that exist in significant numbers in the national economy. With the help of a vocational expert's testimony, he found that she was capable of performing the positions of assembler and mail clerk. *Id.* at 21-22. Thus, the ALJ concluded that O'Connor "has not been under a disability, as defined in the Social Security Act," from the onset date of August 30, 2004 to the June 20, 2007 date of the ALJ's decision. *Id.* at 23.

7

### E.  Contentions of the Parties

O'Connor contends that the ALJ made several errors in determining that she was not eligible for Social Security benefits.  First, O'Connor claims the ALJ improperly discredited her testimony about the extent of her symptoms.  O'Connor's Motion at 16.  Second, she claims the ALJ disregarded the third party questionnaire of O'Connor's husband without comment.  *Id.* at 22.  Third, O'Connor argues that the ALJ improperly rejected the opinion of O'Connor's treating physician, Dr. Faramazyan, in reaching his RFC determination.  *Id.* at 24-26.  Fourth, she claims that the ALJ failed to inquire whether the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"), as required by Social Security Ruling ("SSR") 00-4p.  *Id.* at 27.  Finally, O'Connor argues that the ALJ's conclusion at Step 5 was inconsistent with the VE's testimony in response to the second hypothetical question.  *Id.*

The Commissioner contends that the ALJ's reasons for disregarding O'Connor's testimony were "clear, and convincing," and that these same reasons apply equally to the testimony of her husband.  Commissioner's Motion at 2-4.  The Commissioner also asserts that the ALJ properly evaluated the medical opinion evidence of Dr. Faramazyan in formulating O'Connor's RFC.  *Id.* at 5.  With respect to SSR 00-4p, the Commissioner contends that the VE's testimony is consistent with the DOT, which renders the ALJ's failure to inquire into their consistency harmless error.  *Id.* at 7.  Finally, the Commissioner argues that the ALJ's first hypothetical accurately reflected O'Connor's RFC, rendering the ALJ's conclusion at Step 5 consistent with the VE's testimony.  *Id.* at 5.

### III.  ANALYSIS

### A.  Legal Standard

The Court takes as conclusive any findings of the ALJ that are free from legal error and supported by substantial evidence.  42 U.S.C. §405(g); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence means "more than a mere scintilla"

8

but "less than a preponderance" (citations omitted). *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). In reviewing the record, the Court must consider both "the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen*, 80 F.3d at 1279.

## B.     Claimant's Subjective Testimony

In the Ninth Circuit there are clear procedures for evaluating a claimant's subjective testimony about her symptoms. Assuming there has been no finding of malingering, the judge must first determine whether there is "medical evidence establishing an objective basis for some degree" of the symptoms alleged. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). If such documentation exists, the ALJ may not disbelieve the claimant's testimony as to the severity of such symptoms "solely because the degree of pain alleged by the claimant is not supported by objective medical evidence." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991)). In order to discount the claimant's testimony regarding the extent of her symptoms, the ALJ must articulate "clear and convincing" reasons to do so. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir.1999)).[3] Without "clear and convincing" reasons, the ALJ's credibility finding is not supported by substantial evidence. *See Carmickle v. Comm'r*, 533 F.3d 1155, 1161 (9th Cir. 2008).

In this case, the ALJ found that "the Clamant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR at 20. However, he found her testimony concerning the extent of her symptoms to be not credible and cited five rationales for his finding. The question before the court is whether these rationales provide "clear and convincing" reasons to discredit her testimony. *Valentine*, 574 F.3d at 693.

First, the ALJ noted that O'Connor's medical and psychiatric treatment consisted of "routine outpatient care" rather than emergency care or involuntary internment, which undermined her claim

---

[3]This inquiry is also known as the "Cotton test." *Smolen*, 80 F.3d at 1281-82.

9

to serious mental and physical impairments. AR at 20. The fact that Plaintiff has treated her back pain with Naproxen rather than a more serious medical intervention could reasonably indicate that the pain is not overly severe. *Id.* at 433; *Carmickle*, 533 F.3d at 1162 (noting that a "conservative course of treatment can undermine allegations of debilitating pain"). However, Plaintiff's alleged psychological symptoms are entirely consistent with outpatient treatment. O'Connor testified that she stays in bed most of the day, has trouble concentrating, has panic attacks, and suffers from night terrors and disturbing visions before bed. AR at 428-32. These symptoms are consistent with O'Connor's diagnoses for Major Depressive Disorder and PTSD, which has been treated with medication for several years. *Id.* at 245, 262, 298-99. Nothing in the record suggests that O'Connor's alleged symptoms, if true, would have called for a more aggressive level of treatment. *See Delguidice v. Astrue*, No. C 08-3790 CW, 2009 WL 4507732, at *10 (N.D. Cal. Dec. 1, 2009) ("The ALJ does not explain why the care that Plaintiff received is inconsistent with Plaintiff's subjective testimony about his pain . . . . [N]othing in the record is cited to support this conclusion.") Furthermore, O'Connor has in fact received emergency care and inpatient treatment for her psychiatric symptoms. In addition to being hospitalized for a panic attack in 2005, there is evidence that she was interned for a month in a psychiatric facility in Russia due to suicidal ideation.[4] AR at 269, 175. Thus, the Court is not convinced that O'Connor's record of predominantly outpatient care constitutes a "clear and convincing" reason to discredit her testimony regarding her psychological symptoms. *Valentine*, 574 F.3d at 693.

The ALJ also based his credibility finding on his conclusion that O'Connor tried to misrepresent her fluency in English by asking for an interpreter. The Court is reluctant to penalize claimants for requesting an interpreter unless there is other evidence of manipulation.[5] In this case,

---

[4]The dates of this internment are not clear from the record.

[5] *See Khounmy v. Astrue*, No. CV 09-4561(SH), 2010 WL 2557522, at *4 (C.D. Cal. June 21, 2010) (holding that claimant's decision to testify through interpreter at social security hearing, although he had passed the citizenship test and did not use an interpreter in a doctor's evaluation, did not indicate lack of credibility). *But see Perez v. Astrue*, No. 05-56762, 2007 WL 2693827, at *2 (9th Cir. Sept. 10, 2007) (citing inconsistency about stated language abilities as one of many reasons for discrediting

there is evidence in the record that O'Connor has some difficulty communicating in English. AR at 417 ("It was all depends"); 418 ("They wasn't happy with I, way I stay not alert enough on the, at work. And we have a service, probably say never smile, never happy, and just my outer look wasn't satisfaction to my manager"); 425 ("I felt constantly being sad, being, I feel overwhelming with my negative thoughts"). O'Connor's psychiatrist specifically noted in treatment notes that O'Connor speaks English but "does not understand everything." AR at 264. Because there is no evidence of manipulation in the record and because the record contains evidence of O'Connor's limited English language skills, her request for a translator does not provide a clear basis to discredit her testimony.

On a related note, the ALJ found O'Connor's testimony to be lacking in credibility because it was "vague and non-specific." AR at 20. Several of O'Connor's vague statements during the hearing have clear explanations in the record, suggesting poor communication rather than fabrication. For example, O'Connor testified that sometimes she wakes up in the night and starts running. Her actual words were: "He actually see me a couple of times because I just run away somewhere, I don't know." AR at 428. The ALJ might conclude with good reason that this statement is "vague and non-specific." AR at 20. However, the treatment notes of O'Connor's psychiatrist clarify that O'Connor has flashbacks of childhood abuse by her violent, alcoholic father, and that she wakes up in the night and runs down the hall "trying to evade her father." AR at 265. Because there is evidence in the record that O'Connor's vagueness seems due to her difficulty with the English language, the Court cannot find it to be a "clear and convincing" reason for finding her testimony not credible.

The ALJ did, however, articulate two "clear and convincing" reasons for discrediting O'Connor's testimony. First, the ALJ noted that O'Connor did not visibly manifest any physical or mental problems at the hearing. AR at 20. Personal observation is a permissible ground on which to base a credibility determination. *O'Bosky v. Astrue*, 651 F.Supp.2d 1147, 1163 (E.D. Cal. 2009) ("The ALJ may also rely, in part, on his own observations."); *Sanches v. Shalala*, Civ. No. 94-

---

claimant's testimony).

11

1  20698, 1995 WL 456342, at *4 (N.D. Cal. July 27, 1995) (noting in credibility determination that
2  claimant "sat through the entire hearing without signs of discomfort"); *see Han v. Bowen*, 882 F.2d
3  1453, 1458 (9th Cir. 1989) (concluding that claimant's behavior at the hearing was sufficient
4  justification for finding his testimony not credible).

5  Second, the ALJ noted that O'Connor has traveled to Russia on multiple occasions to visit
6  her family and get treatment, which the ALJ considered to be inconsistent with O'Connor's
7  "allegations of a total inability to function both physically and mentally." AR at 20. O'Connor
8  testified that she stays inside most of the time, and even quit her job at Olin Mills, out of fear that
9  she will have a panic attack. AR at 424, 433. The fact that she is not afraid to get on a plane and
10 travel to Russia might reasonably suggest that her anxiety is not as debilitating as she claims.
11 O'Connor's trips to Russia provide a "clear and convincing" reason to discount her testimony about
12 her panic attacks.

13 Although some of the ALJ's stated reasons for discrediting O'Connor's testimony are not
14 "clear and convincing," such error is harmless if the other permissible justifications constitute
15 substantial evidence for the ultimate credibility finding. *Carmickle*, 533 F.3d at 1162. O'Connor's
16 behavior and demeanor at the hearing, as well as her trips to Russia, provide substantial evidence for
17 discrediting her testimony concerning the extent of her physical and psychological symptoms.

### C.    Mr. O'Connor's Questionnaire

19 In the Ninth Circuit, the ALJ must consider and credit lay witness testimony[6] unless he gives
20 reasons "germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) (holding
21 that "friends and family members in a position to observe a claimant's symptoms and daily activities
22 are competent to testify as to her condition"); *Stout v. Comm'r.*, 454 F.3d 1050, 1053 (9th Cir. 2006)
23 ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony

---

[6] In this case, the husband's testimony took the form of a third-party questionnaire, rather than live testimony at the hearing. However, the standards discussed above are "equally applicable to written statements." *Tyler v. Astrue*, No. CV 08-4409 JC, 2010 WL 2135360, at *7 (C.D. Cal. May 21, 2010); see *Robertson v. Astrue*, No. EDCV 09-1419 SS, 2010 WL 2569184, at *4-6 (C.D. Cal. June 22, 2010) (treating third party questionnaires as testimony); *Farias v. Astrue*, No. 1:09cv0286 DLB, 2010 WL 796768, at *7 (E.D. Cal. Mar. 5, 2010) (same).

12

1  concerning a claimant's ability to work."); *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)
2  ("Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take
3  into account" and therefore "*cannot* be disregarded without comment").

4  In this case, the ALJ noted that O'Connor's "husband completed a third party function
5  questionnaire alleging similar symptoms and limitations [to those O'Connor alleged], indicating that
6  he has to help her with many tasks including reminding her to take her medication." AR at 20. The
7  ALJ then proceeded to discredit O'Connor's testimony on the five grounds discussed above. He did
8  not indicate whether he credited Mr. O'Connor's testimony, nor did he list any reasons "germane" to
9  him specifically. *Dodrill*, 12 F.3d at 919. Although it is not entirely clear whether the ALJ
10 disbelieved Mr. O'Connor's testimony, he certainly failed to comment on it. *Stout*, 454 F.3d at 1054
11 (remanding where ALJ neglected to discuss lay testimony in his opinion, because "the ALJ's silent
12 disregard of the lay testimony contravenes our case law and the controlling regulations"). Thus, the
13 Court finds that Mr. O'Connor's testimony was discarded in violation of Ninth Circuit law. *Id.*

14 The Ninth Circuit has cautioned against finding such failure to be harmless error. Rather, the
15 Ninth Circuit has "consistently reversed the Commissioner's decisions for failure to comment on
16 such competent testimony." *Id.* at 1056. In such cases, "a reviewing court cannot consider the error
17 harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the
18 testimony, could have reached a different disability determination." *Id.* at 1056. This Court cannot
19 find that, fully crediting Mr. O'Connor's testimony, no reasonable ALJ could find O'Connor
20 disabled. As the Ninth Circuit concluded recently, after finding that lay testimony was improperly
21 disregarded: "While there may be substantial evidence in the record to support the ALJ's ultimate
22 determination, and the ALJ might properly reject [the lay witness's] testimony on other grounds, we
23 cannot say that no reasonable ALJ would have reached a different disability determination."
24 *McCutcheon v. Astrue*, No. 09-35548, 2010 WL 1767269, at *1 (9th Cir. May 4, 2010).[7] Given the

---

[7] Because this decision is unpublished, it is persuasive rather than binding authority. *See* Ninth Circuit Rule 36-3.

13

clear Ninth Circuit authority on this issue, the Court finds that the ALJ's treatment of Mr. O'Connor's questionnaire constitutes legal error.

### D.     Dr. Faramazyan's Treatment Records

O'Connor claims that the ALJ improperly ignored the opinion of her treating physician, Dr. Faramazyan, in formulating her RFC.[8] O'Connor's Motion at 25; *see Lusardi v. Astrue*, 350 Fed.Appx. 169, 173 (9th Cir. 2009) (In determining claimant's RFC, ALJ must not reject "significant probative evidence" without explanation). Specifically, Dr. Faramazyan diagnosed O'Connor with recurrent Major Depressive Disorder and PTSD, and assessed her at a Global Assessment of Functioning ("GAF") of 50, which is in the range of "serious impairment" under the DSM-IV. O'Connor's Motion at 25; AR at 265, 267. The ALJ concluded that O'Connor possessed the RFC to perform "less than a full range of light work" and that "due to her history of intermittent depression and anxiety, she is restricted to the performance of simple, repetitive work activity with no more than the occasional contact with co-workers, the public, or supervisors; and she is limited to low stress work, performed at lower competitive levels with very basic one and two step job requirements." AR at 18. The ALJ did not at any point mention O'Connor's PTSD diagnosis or GAF score of 50. Furthermore, the ALJ found O'Connor's depression and anxiety to be "mild to moderate" and "intermittent." AR at 18, 21. By contrast, Dr. Faramazyan's records indicate a consistent diagnosis of "Major Depressive Disorder" over a period of several years. *See, e.g.,* AR at 246, 250, 265, 298-99.

A treating physician's opinion is "entitled to 'substantial weight,'" *Bray v. Comm'r*, 554 F.3d 1219, 1228 (9th Cir. 2009), and specifically carries more weight than the opinion of a non-treating

---

[8] Dr. Faramazyan did not testify or write a report for the hearing. The "opinions" discussed here are her diagnoses from treatment notes and medical records. *See Ryan v. Comm'r*, 528 F.3d 1194, 1201 n.6 (9th Cir. 2008) (treating medical records of a physician as an "opinion"); *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (treating diagnosis from medical records as an "opinion" entitled to deference).

14

1 physician. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ may not "reject the
2 opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without
3 providing specific and legitimate reasons supported by substantial evidence in the record." *Rollins
4 v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Lingenfelter v. Astrue*, 504 F.3d 1028, 103 (9th Cir.
5 2007) (finding legal error where ALJ only "briefly mentioned" the opinion of one treating physician
6 and "did not acknowledge" the other at all).[9]  "The ALJ can meet this burden by setting out a
7 detailed and thorough summary of the facts and conflicting clinical evidence, stating [her]
8 interpretation thereof, and making findings." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.
9 2008) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). In this case, the ALJ relied
10 heavily on the report of an examining physician, Dr. Aulakh, but did not mention Dr. Faramazyan's
11 diagnoses. AR at 21. Significantly, the ALJ's decision does not mention O'Connor's diagnosis for
12 PTSD at all. Thus, the Court finds that the ALJ improperly ignored the opinion of O'Connor's
13 treating physician without providing "specific and legitimate" reasons. *Rollins*, 261 F.3d at 856.

### E.     Conflict with DOT

15 Social Security Ruling 00-4p provides that the ALJ has an "affirmative responsibility to ask
16 about any possible conflict" between the VE's testimony and the "information provided in the
17 [DOT]." SSR 00-4p at *4.  Failure to inquire into consistency with the DOT is legal error. *Id.*
18 *Massachi v. Astrue*, 486 F.3d 1149, 1150, 1152 (9th Cir. 2007). However, failure to inquire
19 constitutes harmless error if there is no conflict between the VE's testimony and the DOT, or if VE
20 sufficiently explains the reasons for her divergence from the DOT. *Massachi*, 486 F.3d at 1154 n.19
21 ("This procedural error could have been harmless, were there no conflict, or if the vocational expert
22 had provided sufficient support for her conclusion so as to justify any potential conflicts."); *see, e.g.,
23 Czajka v. Astrue*, No. SACV 09-00194-MAN, 2010 WL 3293350, at *3 (C.D. Cal. Aug. 18, 2010)

---

[9] If the opinion of the treating physician is uncontradicted, the ALJ must give "clear and convincing" reasons for discounting it. *Bray v. Comm'r*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009). However, in this case Dr. Faramazyan's PTSD diagnosis and GAF score are contradicted by Dr. Aulakh's evaluation, which did not diagnosis O'Connor with PTSD and placed her at a GAF of 58. AR at 177.

1  ("Although SSR 00-4p requires that an ALJ expressly ask a vocational expert whether his testimony
2  conflicts with the DOT, the ALJ's failure to do so here was harmless error, as there is no departure
3  from the DOT.").

4  In this case, the ALJ limited O'Connor to "simple, repetitive work activity with no more than
5  occasional contact with coworkers, the public, or supervisors." AR at 21. He also limited her to
6  "low stress work, performed at lower competitive levels with very basic one and two step job
7  requirements." *Id.* The VE testified that, given those limitations, O'Connor could perform the
8  functions of bench assembly and mail clerk. AR at 443. The plaintiff contends that this testimony
9  conflicts with the DOT, which lists those positions at reasoning levels two and three, respectively.[10]
10 O'Connor's Motion at 29. Thus, O'Connor claims that her restriction to "simple, repetitive work"
11 and "very basic one and two step job requirements" limits her to positions with a reasoning level of
12 one in the DOT. *Id.* at 28-29.

13 While the Ninth Circuit has not addressed this question directly, *Stroda v. Astrue*, No. C09-
14 5112BHS, 2010 WL 129814, at *11 (W.D. Wash. Jan. 11, 2010), district courts in this Circuit have
15 concluded that level two positions in the DOT are consistent with an RFC for "simple, repetitive
16 labor." *See, e.g., McGensy v. Astrue*, No. EDCV 09-152 AGR, 2010 WL 1875810, at *3 (C.D. Cal.
17 May 11, 2010) (holding that "a limitation to 'simple, repetitive tasks' is consistent with level two
18 reasoning"); *Vasquez v. Astrue*, No. CV 08-5305-OP, 2009 WL 3672519, at *3 (C.D. Cal. Oct. 30,
19 2009) (finding that "the DOT's reasoning development Level two requirement does not conflict with
20 the ALJ's prescribed limitation that Plaintiff could perform only simple, routine work"); *Tudino v.
21 Barnhart*, No. 06-CV-2487-BEN (JMA), 2008 WL 4161443 at *11 (S.D. Cal. Sept. 5, 2008)
22 (surveying cases and noting that "[l]evel-two reasoning appears to be the breaking point for those
23 individuals limited to performing only simple repetitive tasks"); *Meissl v. Barnhart*, 403 F.Supp.2d

---

[10] The DOT defines level two reasoning as "applying commonsense understanding to carry out detailed but uninvolved written or oral instructions," while level one reasoning is marked by the ability to "[a]pply commonsense understanding to carry out simple one-or two-step instructions [and] deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *McGensy v. Astrue*, No. EDCV 09-152 AGR, 2010 WL 1875810, at *3 (C.D. Cal. May 11, 2010) (citing DOT Appendix C).

16

981, 984-85 (C.D. Cal. 2005) (finding level two reasoning consistent with an RFC for "simple, routine, repetitive, concrete, tangible tasks"). This Court agrees that there is no conflict between the DOT's definition of level two reasoning and the VE's testimony that O'Connor is capable of performing the position of bench assembly. Thus, the ALJ's failure to ask about any conflict was harmless error. *Massachi*, 486 F.3d at 1154 n.19.

By contrast, most district courts in this Circuit have found level three reasoning to be inconsistent with an RFC for simple, repetitive labor. *See, e.g., Torrez v. Astrue*, No. 1:09-cv-00626-JLT, 2010 WL 2555847, at *9 (E.D. Cal. June 21, 2010); *Bagshaw v. Astrue*, No. EDCV 09-1365-CT, 2010 WL 256544, at * 5 (C.D. Cal. Jan. 20, 2010); *Pak v. Astrue*, No. EDCV 08-714-OP, 2009 WL 2151361, at *7 (C.D. Cal. July 14, 2009). Thus, the VE's testimony that O'Connor could serve as a mail clerk conflicts with the DOT.

Despite this conflict, there are sufficient bench assembly positions to meet the commissioner's burden at Step Five. *See Koch v. Astrue*, No. CV. 08-609 PK, 2009 WL 1743680, at *18 (D. Or. June 15, 2009) (Although "ALJ erred in relying on the vocational expert's testimony that [Claimant] could perform the duties of a mail clerk, such error was harmless because the ALJ's finding that [claimant] could perform work as a price marker adequately supports her adverse disability finding."). The Ninth Circuit has held that "between 1,000 and 1,500 jobs in the regional economy constitutes a significant number for purposes of the meaning of the Social Security Act." *Mickelson-Wurm v. Comm'r Soc. Sec. Admin.*, No. 06-35550, 2008 WL 2795881, at *4 (9th Cir. 2008) (citing *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)). In this case, the VE testified that there are about 2,500 bench assembly positions in the Bay Area and over 200,000 in the national economy. AR at 443. Because this is sufficient to meet the Commmissioner's burden at Step 5, the ALJ's failure to inquire into any conflict with the DOT is harmless error.

### F.   VE's Testimony at Step 5

O'Connor argues that the ALJ ignored the VE's response to the second hypothetical question, which accurately captured O'Connor's limitations. O'Connor's Motion at 24, 27. She implies that the first hypothetical question did not include all relevant information about O'Connor's

17

limitations, and was thus without evidentiary value. *See Carmickle,* 533 F.3d at 1166 (VE's testimony "has no evidentiary value" if hypothetical question was incomplete); *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) ("Hypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.' [citation omitted]. If the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value."); *Andrews v. Shalala*, 53 F.3d 1035, 1044 (9th Cir. 1995) (holding that VE's testimony in response to an incomplete hypothetical question is insufficient to carry Commissioner's burden at Step 5). The ALJ had already found at Step 3 that O'Connor had a "mild to moderate limitation in her ability to maintain concentration, persistence or pace." AR at 18. However, the ALJ declined to include this significant limitation in his first hypothetical question. Therefore, the VE's finding that O'Connor could perform the duties of bench assembler and mail clerk was without evidentiary value. *See Carmickle,* 533 F.3d at 1166; *Lewis*, 236 F.3d at 517.

In the second hypothetical, the ALJ added a moderate restriction in the area of "concentration, persistence, and pace." AR at 443-44. The VE testified that this restriction would "completely erode the labor base" and render the individual incapable of assembly and mail clerk work. AR at 444. In finding that O'Connor could still complete the two positions originally listed by the VE, the ALJ disregarded the explicitly contradictory testimony of the VE. Because the ALJ did not establish that O'Connor was capable of adjusting to other work in the national economy despite all of her limitations, the Commissioner failed to carry his burden at Step 5. 20 C.F.R. §404.1560(c)(2); *Valentine,* 574 F.3d at 689. Thus, the ALJ's determination that O'Connor is capable of adjusting to other work is unsupported by substantial evidence.

### C. Judicial Award of Benefits

"The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court." *Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, "where the record has been developed fully and further administrative proceedings would serve no useful purpose, the

district court should remand for an immediate award of benefits." *Id.* With respect to an ALJ's improper disregard of testimony:

> [T]he district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id. See also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995) (Where the ALJ "fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law'" (citation omitted)); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007) (When an ALJ's "reasons for rejecting the claimant's testimony are legally insufficient and it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony," the court should remand for a calculation of benefits) (quoting *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003)).

In this case, the ALJ made three errors of law. First, he improperly disregarded the third party questionnaire without stating reasons "germane" to Mr. O'Connor specifically. *Dodrill*, 12 F.3d at 919. Second, he improperly ignored the diagnoses of O'Connor's treating physician, Dr. Faramazyan, without citing "specific and legitimate" reasons. *Rollins*, 261 F.3d at 856. Finally, he failed to carry his burden at Step 5 by relying on an incomplete hypothetical question, while ignoring the VE's testimony in response to the complete hypothetical question. *See Carmickle,* 533 F.3d at 1166; *Lewis*, 236 F.3d at 517.

It is not immediately clear whether, crediting Mr. O'Connor's and Dr. Faramazyan's opinions, the ALJ would be required to find O'Connor disabled. *Orn*, 495 F.3d at 640. However, the ALJ's failure to carry his burden at Step 5 is not easily remedied through further development of the record. The ALJ's first hypothetical question was incomplete according to *his own findings*, even without considering Mr. O'Connor or Dr. Faramazyan's opinions. Since the ALJ failed to carry his burden at Step 5, even after fully developing the record and personally examining the VE, a remand for further proceedings would unnecessarily prolong the process and "serve no useful

19

purpose." *Benecke*, 379 F.3d at 593.  Indeed, the VE testified that, with the limitations that the ALJ failed to include in his first hypothetical, claimant would be incapable of working.  Therefore, a remand for award of benefits is appropriate in this case.

**IV.    CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiff's motion and DENIES the Commissioner's motion.  The Court reverses the ALJ's decision and remands Plaintiff's claim for an award of benefits.

IT IS SO ORDERED.

Dated:  September 27, 2010

_____
JOSEPH C. SPERO
United States Magistrate Judge

20